RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0140P (6th Cir.)
File Name: 02a0140p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

MICHAEL A. MULHALL,
       *Plaintiff-Appellant,*

    *v.*

JOHN ASHCROFT, in his
official capacity as Attorney
General, and the FEDERAL
BUREAU OF INVESTIGATION,
       *Defendants-Appellees.*

No. 00-6634

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 98-00171—Charles R. Simpson III, District Judge.

Argued: March 5, 2002

Decided and Filed: April 23, 2002

Before: MOORE and COLE, Circuit Judges; TARNOW,
District Judge.

—————————————

*The Honorable Arthur J. Tarnow, United States District Judge for
the Eastern District of Michigan, sitting by designation.

1

---

## COUNSEL

**ARGUED:** James M. Bolus, Jr., BOLUS & RAGLAND, Louisville, Kentucky, for Appellant.    Daniel Bensing, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** James M. Bolus, Jr., BOLUS & RAGLAND, Louisville, Kentucky, Thomas E. Clay, Louisville, Kentucky, for Appellant. Daniel Bensing, Marleigh D. Dover, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge.    Plaintiff Michael A. Mulhall appeals the grant of summary judgment on his Title VII retaliation claim.   On the merits, we find no error in the district court's judgment with respect to Defendant Attorney General John Ashcroft because Mulhall failed to produce either direct or circumstantial evidence from which a reasonable factfinder could infer that his supervisors knew of his protected activity.  However, we must remand so the district court may amend its order in the present case. Although Mulhall sued both the FBI and then-Attorney General Janet Reno in her official capacity, the district court entered judgment for the FBI only.  The district court clearly intended to issue a final order in granting summary judgment to the FBI, and thus its omission of the attorney general could be described as a merely technical error.  But, under 42 U.S.C. § 2000e-16, the attorney general, rather than the FBI, was the only proper defendant in the present case.  Thus, we **VACATE** the district court's judgment and **REMAND** to the district court so that it may amend its order.

### III. CONCLUSION

For the foregoing reasons, we **VACATE** the judgment of the district court and **REMAND** so that the district court may amend its order to grant summary judgment to Attorney General Ashcroft and to dismiss the claims against the FBI.

was on the witness list or that Beyer informed Metcalfe and Ray of that fact.

In sum, the district court did not err in concluding that Mulhall has failed to produce evidence sufficient to establish that the officials taking the adverse employment action knew of his protected activity. Mulhall has not produced direct or circumstantial evidence that Metcalfe and Ray knew that he was listed as a witness by Henderson prior to the drafting and sending of the letter to Mulhall's JCPD superiors. Nor has he produced evidence from which one could reasonably infer that Metcalfe and/or Ray knew of his protected activities. A reasonable jury could not find retaliation on these facts, and thus summary judgment was proper.

Finally, Mulhall also argues on appeal that the district court erred in granting summary judgment in the present case because that court effectively revisited its earlier finding that he had established a prima facie case of retaliation. Mulhall asserts that this was contrary to our holding in *Avery Dennison*. However, *Avery Dennison* held only that "it is inappropriate for a court to resolve a discrimination case on grounds that a *prima facie* case had not been made, *after the case has been fully tried on the merits*." *Avery Dennison*, 104 F.3d at 860 (emphasis added). *See also Kovacevich v. Kent State Univ.*, 224 F.3d 806, 825 (6th Cir. 2000) ("*Avery Dennison* stands for the simple proposition that in reviewing the facts of a discrimination case *after there has been a full trial on the merits*, a district court . . . must focus on the ultimate question of discrimination rather than on whether a plaintiff made out her prima facie case.") (emphasis added). In the present case, the district court granted summary judgment prior to trial on the merits, and thus it did not err in revisiting its holding on the defendants' renewed motion for summary judgment in light of the additional evidence uncovered during discovery.

## I. BACKGROUND

Mulhall is a Jefferson County, Kentucky, police officer. He was assigned to the Louisville Fugitive Task Force ("LFTF"), from March 14, 1994 to March 15, 1995. The LFTF is a joint effort of the FBI, U.S. Marshals Service, the Louisville Police Department, and the Jefferson County Police Department ("JCPD"). The JCPD's decision to remove Mulhall from the LFTF and reassign him, effective March 16, 1995, is at the heart of Mulhall's Title VII retaliation case.

Mulhall's reassignment was prompted by a seemingly innocuous letter sent by FBI Supervisory Special Agent ("SSA") Hal Metcalfe to Mulhall's JCPD superior, Chief of Police Leon E. Jones, on February 27, 1995. *See* Joint Appendix ("J.A.") at 13 (Compl. ¶ 14). SSA Metcalfe was assisted in preparing this letter by Special Agent ("SA") Michael Ray. Metcalfe's letter requested that the JCPD review Mulhall's time and attendance records for the period March 24, 1994 through February 21, 1995, purportedly so that the JCPD and FBI could prepare for a financial audit of the LFTF's records by FBI headquarters. *See* J.A. at 139 (Metcalfe Letter). The JCPD's review of Mulhall's time sheets and attendance records led to a JCPD Internal Affairs ("IA") investigation into Mulhall's activities, *see* J.A. at 559 (Internal Affairs Rep.), and his removal from the LFTF. Thus, the letter from Metcalfe to Jones constitutes the challenged adverse employment action in the present case.

The specific charges against Mulhall related to his recording of overtime hours. As presented by SSA Metcalfe and SA Ray, Mulhall had been defrauding the government by claiming to have worked hours that he had not worked. *See, e.g.*, J.A. at 554 (Zaboronak Dep.). The actual discrepancies in the time sheets — which are peripheral to the issues presented on this appeal — stemmed, apparently, from the differences in the rules for compensating overtime for the JCPD and FBI. Mulhall was eventually cleared of any wrongdoing by the IA investigation, and no criminal charges were ever brought against him.

The parties to the present case do not dispute, on appeal, that the Metcalfe letter, which resulted in Mulhall's reassignment, constitutes an adverse action. Nor do they dispute, on appeal, that Mulhall was engaged in a protected activity prior to the adverse action. Mulhall was named as a witness in former SA Jeanne James Henderson's EEO complaint against another FBI agent. *See* J.A. at 219 (Henderson EEO Compl.), 297 (Henderson Aff.). This would constitute a protected activity under 42 U.S.C. § 2000e-3(a), which prohibits discrimination for "assist[ing ] or participat[ing] in any manner in an investigation, proceeding, or hearing under" Title VII.

Instead, the parties dispute whether SSA Metcalfe and SA Ray knew that Mulhall was listed as a witness by Henderson at the time that they drafted and sent the letter to Mulhall's JCPD supervisor. For their part, Metcalfe and Ray unequivocally deny any knowledge of that crucial fact on or before February 27, 1995. The facts underlying these denials are as follows. On or about February 21, 1995, SA David Beyer, chief counsel at the Louisville FBI office, received by mail a package that contained Henderson's fifty-eight-page sworn statement. Mulhall's name was the last name on the list of witnesses in the sworn statement — it appeared on page fifty-eight, the last page. The package was addressed to Beyer but indicated, in a notation written on the envelope, that Beyer should deliver the package to SA Russ Pulley, the EEO investigator assigned to Henderson's complaint. Beyer placed the package in his office safe; he claims not to have opened the package at the time or to have read its contents. *See* J.A. at 133-34 (Beyer Dep.). On February 24, Pulley contacted Beyer, told him that the package contained Henderson's sworn statement, and requested that Beyer make a copy of it and send the copy to Henderson's attorney. Beyer complied with Pulley's request by opening the package, copying the statement using a photocopier with an automatic feeder, and delivering the copy, in a sealed envelope, to the mailroom of the FBI office. He claims not to have read the statement while copying it, and thus he claims that he was not aware

official, who actually fired the plaintiff, made it "highly improbable . . . that [the first official] would not have discussed plaintiff's complaint with [the second official] as soon as [the first official] obtained this information." *Id.* at 1010. *Kralowec*, which Mulhall cites on appeal, is distinguishable from the present case, however, in that the first official actually participated in drafting the charges against the plaintiff that resulted in her discharge. *See id.* at 1009. Given this level of involvement by an official with knowledge of the protected activity, the complaint in that case, the inference that the official who actually decided to fire the plaintiff was eminently reasonable. Mulhall has never argued that Beyer actually participated in the adverse employment action in the present case; nor has Mulhall alleged facts of prior interactions between Beyer, on the one hand, and Metcalfe and Ray, on the other, that make it reasonable to infer that the former would discuss Mulhall's inclusion on Henderson's witness list "as soon as [he] obtained this information."

Moreover, there was evidence in *Kralowec* that the first official actually knew of the plaintiff's complaint. *See id.* at 1009-10. Mulhall has not produced evidence that Beyer actually knew that Henderson had listed him as a witness. Even if we infer that Beyer saw Mulhall's name on the witness list when he photocopied Henderson's sworn statement, despite Beyer's deposition testimony to the contrary, in order to reverse the district court we would have to go further and infer that Beyer shared this information with Metcalfe and/or Ray. There is simply no evidence in the record, direct or circumstantial, to support such an inference, other than the adverse action itself. Mulhall, however, continues to assert that "Beyer disseminated Mulhall's name," going so far as to claim that discovery has made this "an even more realistic possibility." Appellant's Br. at 38. But this assertion is based on purported credibility issues and inconsistent statements by Beyer, not evidence of interactions between Beyer and the other FBI agents. *See id.* at 39-41. None of the inconsistencies pointed to by Mulhall point toward the conclusion either that Beyer knew that Mulhall

corrections officer in his cell block had been transferred. The plaintiff, however, was the only transferred officer to file a grievance complaining of the transfer, and he was the only transferred officer returned to the cell block. *See id.* Given that the supervisor took an action with respect to the plaintiff, other than the challenged adverse action, from which it could be inferred that the supervisor was aware of the plaintiff's grievance, we held that the plaintiff had met his burden on this element of his case. In contrast, Mulhall has not produced any evidence of other actions taken by Metcalfe and Ray, other than the challenged adverse action, from which a reasonable jury could infer that they knew that Mulhall had been listed as a witness in Henderson's complaint.

Similarly, in *Polk v. Yellow Freight System, Inc.*, 876 F.2d 527, 531 (6th Cir. 1989), we held that the plaintiff had presented sufficient evidence to support the inference that her employer knew of her protected activity (in that case, the plaintiff had visited the Michigan Department of Civil Rights to inquire about her rights) where plaintiff testified that her supervisor told her "I know where you've been." *Id.* This statement was circumstantial evidence of the supervisor's knowledge in that the testimony itself did not establish that the supervisor knew of the plaintiff's protected activity, but a reasonable jury could infer from the testimony that the supervisor knew of the protected activity at issue. In the present case, Mulhall has not presented evidence of statements by Metcalfe or Ray from which a reasonable jury could infer that they knew of his protected activity.

In a similar vein, at least one district court has concluded that knowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action. *Kralowec v. Prince George's County, Maryland*, 503 F. Supp. 985 (D. Md. 1980), *aff'd*, 679 F.2d 883 (4th Cir.), *cert. denied*, 459 U.S. 872 (1982), held that the plaintiff had met her burden where she produced evidence that one county official knew of the plaintiff's complaint and that the "prior interaction" of that first official with the second

that Mulhall's name appeared on the witness list on the last page of the statement. *See* J.A. at 134-35 (Beyer Dep.).

On March 2, 1995, Henderson's attorney contacted Beyer to inform him that the copy of Henderson's statement had not arrived. Beyer followed up with the mailroom employee and discovered that the statement, still in its sealed envelope, was still in the mailroom employee's mailbox. *See* J.A. at 135. Upon making this discovery, Beyer composed a memorandum regarding the mishandling of the package because, he claims, he was concerned that Henderson would see this as an opportunity for additional litigation against the FBI. *See* J.A. at 129-30 (Beyer Memo.).

Mulhall's theory of the case is that Metcalfe and Ray discovered that Mulhall was listed as a witness by Henderson sometime between the arrival of the Pulley package in the Louisville FBI office on February 21, 1995, and the mailing of the letter to Mulhall's JCPD superior on February 27, 1995. During that time, the Henderson statement was in Beyer's possession, locked in his personal safe, and, between February 24 and March 2 or 3, the copy of the statement made by Beyer was in the mailroom employee's unsecured mailbox in the mailroom. Opposing the defendants' motion for summary judgment, Mulhall argued that the facts surrounding the delivery of the Henderson statement to the Louisville FBI office and its mishandling during the key period of time give rise to the inference that Metcalfe and Ray discovered that Mulhall was listed as a witness by Henderson prior to the drafting and sending of the letter to Mulhall's JCPD superior.

Mulhall has developed three distinct theories to explain how Metcalfe and Ray learned that he was listed as a witness in Henderson's statement and thus why they drafted and sent the letter. First, Mulhall asserts that Beyer could have read the statement, either after receipt or while photocopying it, and then disseminated the relevant information to Metcalfe and Ray. *See* J.A. at 247. Second, Mulhall speculates that either Metcalfe or Ray could have opened the sealed envelope in the mailroom employee's mailbox, read the statement, and

then resealed the envelope. *See* J.A. at 248. Mulhall asserts that the practice of opening mail addressed to others (called "bagging") was common in the Louisville FBI office. *See* J.A. at 248. He also claims that Metcalfe and Ray were trained to open mail and reseal envelopes without being detected. *See* J.A. at 248.[1] Third, Mulhall suggests that the mailroom at the Louisville FBI office would have opened the package, which was addressed to SA Pulley, an "unknown" agent, upon delivery, and that Metcalfe and Ray discovered its contents as a result. *See* J.A. at 247; Appellant's Br. at 38.

In offering these theories, Mulhall points to the unusual mailing of the package from Washington, D.C., to the Louisville FBI office — Pulley, the EEO investigator, worked out of the Memphis office, *see* J.A. at 232-33 — and attempts to undermine the credibility of Beyer, Metcalfe, and Ray. He attacks Beyer's credibility by pointing to minor inconsistencies between the March 3, 1995 memo composed by Beyer and Beyer's later deposition testimony. *See* J.A. at 246; *see also* Appellant's Br. at 39-41 (listing eight inconsistencies). He attacks the credibility of Metcalfe and Ray by pointing to Ray's history of lying and falsifying documents, *see* J.A. at 249, and Metcalfe's history of retaliating in Title VII cases, *see* J.A. at 250.

Mulhall filed this action against the FBI and then-Attorney General Reno on March 6, 1998, after having exhausted his administrative remedies. The defendants moved to dismiss the case or, in the alternative, for summary judgment, prior to discovery, claiming, *inter alia*, that Mulhall had failed to establish a prima facie case of Title VII retaliation. The district court, treating this motion as one for summary judgment, denied the motion, holding that "the circumstances

---

[1] In his brief, Mulhall argues that "[s]pecial agents have the ability to open up and reseal envelopes without being detected. Ray was in counter intelligence during the Cold War where he spied on spies. Metcalfe has received specialized training in surveillance techniques from New Scotland Yard . . . and the Central Intelligence Agency . . . ." Appellant's Br. at 17-18 (citations omitted).

The facts in the present case are similar. Metcalfe and Ray have testified that they did not know of Mulhall's protected activity when they took the adverse employment action. Beyer also testified that he did not know of Mulhall's protected activity and thus that he did not convey that information to either Metcalfe or Ray. Mulhall argues in response that none of these statements are credible, but he has failed to produce any evidence, direct or circumstantial, to rebut these denials. Mulhall offers only conspiratorial theories, not the specific facts required under the Federal Rule of Civil Procedure 56. *Cf. Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc) (holding that summary judgment was appropriate where the inferences plaintiff sought to draw from evidence were akin to "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from [personal] experience").

In most Title VII retaliation cases, the plaintiff will be able to produce direct evidence that the decision-making officials knew of the plaintiff's protected activity.[5] In many such cases, for example, the adverse action will be taken by the same supervisor to whom the plaintiff has made complaints in the past. But direct evidence of such knowledge or awareness is not required, and, as Mulhall correctly argues, a plaintiff may survive summary judgment by producing circumstantial evidence to establish this element of her claim. For example, *Allen* held that the plaintiff had put forward sufficient circumstantial evidence that his supervisor was aware of his protected activity (the filing of grievances, in that case) to establish this element of his claim. *See* 165 F.3d at 413. In *Allen*, the plaintiff and every other African American

---

[5] In an unpublished case, we have previously noted: "Although the paradigm established by *McDonnell[ ]Douglas Corp. v. Green* was designed to accommodate discrimination claims based on circumstantial evidence, a plaintiff relying on this paradigm to prove unlawful retaliation typically has direct evidence that the defendant was aware of the plaintiff[']s protected activity." *Peterson v. Dialysis Clinic, Inc.*, No. 96-6093, 1997 WL 580771, at *4 (6th Cir. Sept. 18, 1997) (citations omitted).

and the adverse employment action through circumstantial evidence. Temporal proximity, when coupled with other facts, may be sufficient in certain cases to establish the causal-connection prong in a Title VII case. *See, e.g., Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000) (noting that "there may be circumstances where evidence of temporal proximity alone would be sufficient to support" the inference of a causal connection but that temporal proximity, without more, was insufficient in the case before the court). In the present case, however, the district court granted summary judgment because Mulhall failed to produce any direct or circumstantial evidence from which a reasonable jury could infer that Metcalfe and Ray *knew or were aware of his protected activity.*

In *Fenton v. HiSAN, Inc.*, 174 F.3d 827 (6th Cir. 1999), this court affirmed the grant of summary judgment where the plaintiff was unable to produce evidence sufficient to establish that the individuals charged with taking the adverse employment action knew of the protected activity. *See id.* at 832. The adverse action was the transfer of the plaintiff to the "B" shift. The *HiSAN* court held:

> Although Fenton met with Rice and Don Turner, Rice's supervisor and the plant superintendent, she is unable to produce any evidence that the relevant management decision-makers who moved her to the "B" shift — Rebecca Shenk and John Miller — knew of her complaints . . . when they decided to transfer her. Shenk testified that she was not informed of plaintiff's complaints until . . . . October 7, 1996 [four days after Fenton was informed of her transfer]. According to Miller's testimony, he and Shenk decided either on September 30 or October 1, 1996, that plaintiff . . . was to be transferred to the "B" shift. . . . Therefore, . . . [plaintiff] has not met her burden of showing that her protected activity was known to those who made that decision.

*Id.*

surrounding the initiation of the investigation and Mulhall's removal from the Task Force, when viewed as a whole, raise[] an inference of retaliation by the FBI sufficient to establish a prima facie case of causal connection." J.A. at 65. The district court noted in a footnote that its findings in this respect were "made under the lower burden of proof required to sustain a prima facie case, rather than that which is required to win a judgment on the ultimate issue of discrimination." J.A. at 65 n.2. In its opinion, the district court discussed Mulhall's theory that Beyer had communicated the fact that Mulhall was listed as a witness by Henderson to Metcalfe and Ray, noting the FBI agents' unequivocal denials on this front, but concluded that Mulhall had presented sufficient circumstantial evidence of a causal connection between the protected activity and the adverse action to survive summary judgment.

In this opinion, issued on April 16, 1999, the district court did not treat the issue of the FBI agents' knowledge as a separate element of Mulhall's prima facie case. The FBI[2] renewed its motion for summary judgment at the conclusion of discovery. One of the main thrusts of the FBI's renewed motion for summary judgment was that Mulhall could not establish a prima facie case of retaliation because he could not "demonstrate that the FBI knew that his name was listed as a witness on . . . Henderson's signed sworn statement." J.A. at 71. To support its argument that such knowledge was a separate element of Mulhall's prima facie case, the FBI cited our decision in *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831 (6th Cir. 1999). The FBI argued:

---

[2] The second motion for summary judgment dropped Attorney General Reno from the caption. *See* J.A. at 71; *but see* J.A. at 8 (Dist. Ct. Docket) (referring to motion as that of defendants Reno and the FBI). The district court did not detect this error and granted summary judgment to the FBI in its order without mention of Attorney General Reno. *See* J.A. at 35 (Order). The district court docket recorded this order as granting summary judgment "in favor of the FBI." J.A. at 8.

After extensive discovery, plaintiff can point to no evidence whatsoever that SSA Metcalfe knew that plaintiff was listed as a witness on Ms. Henderson's statement at the time he sent his February 27, 1995 letter to the JCPD.

It appears that plaintiff's only "evidence" on the employer knowledge prong of his prima facie case is the closeness in time of two events: the receipt in the FBI Louisville office of . . . Henderson's Signed Sworn statement . . . on February 21 or 22, 1995, and the transmittal of a letter from [Metcalfe] to plaintiff's employer on February 27, 1995, requesting a review of his time sheets. . . .

However this is mere speculation, as plaintiff conceded in his deposition, other than the closeness in time between the two events, he has no evidence that SSA Metcalfe knew that he was listed by Ms. Henderson as a witness.

J.A. at 81-82.

Mulhall responded[3] to the FBI's renewed motion for summary judgment by pointing to the district court's prior finding that he had established a prima facie case of Title VII retaliation. *See* J.A. at 228 (Response). Mulhall also claimed that his prima facie case had been "strengthened through discovery," J.A. at 230, because of the facts regarding the mishandling of the Pulley package and credibility issues that had come to light. In discussing the applicable law, however, Mulhall's response failed to note the distinction drawn in *Fenton* and other cases between (1) demonstrating that a relevant decision-maker knew of the plaintiff's protected activity and (2) establishing a causal link between the protected activity and the adverse action through circumstantial evidence. Thus, Mulhall argued that facts

---

[3]Mulhall's Response properly listed Attorney General Reno as a defendant. *See* J.A. at 228.

in activity protected by Title VII; 2) plaintiff's exercise of his civil rights was known by the defendant; 3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and 4) that there was a causal connection between the protected activity and the adverse employment action." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997). *See also Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363 (6th Cir. 2001) (same); *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 412 (6th Cir. 1999) (same). *Cf. Thaddeus-X v. Blatter*, 175 F.3d 378, 386-87 & n.3 (6th Cir. 1999) (en banc) (stating general test for retaliation claims and noting that the test is often stated as "a four-prong test," treating the defendant's knowledge of the protected conduct as the fourth element). Summary judgment is proper where the plaintiff fails to present evidence sufficient to create a dispute of material fact with respect to an element of his retaliation claim. *See, e.g., Allen*, 165 F.3d at 413.

We agree with the district court's conclusion that Mulhall has failed to present sufficient evidence from which a reasonable jury could infer that Metcalfe and/or Ray knew that Henderson had listed him as a witness in her EEO complaint. On appeal, Mulhall argues that "a wealth of compelling evidence establishes that Metcalfe and Ray had the opportunity to learn Mulhall was an EEO witness," Appellant's Br. at 3, and that "[t]he trial court has, in effect, required Mulhall to produce direct proof of retaliation," *id.* at 5. But, Mulhall contends, "the cases from this and other Circuits are clear that a jury question can be created for a retaliation claim based solely upon circumstantial evidence — i.e., temporal proximity and circumstances as a whole — as to the 'causal connection' element of the claim." *Id.* at 22.

As the last statement indicates, Mulhall's argument on appeal largely ignores the knowledge prong of his Title VII case and focuses on the causal connection prong. The district court did not grant summary judgment to the defendants in the present case because it determined that a plaintiff may not meet his burden of creating an issue of material fact on the issue of a *causal connection* between his protected activity

Similarly, in the present case Mulhall alleges Title VII retaliation by the FBI; the FBI is a subunit of the Justice Department. Therefore, the proper defendant is the Attorney General, the head of the Justice Department. Given the change in presidential administration, Attorney General John Ashcroft is the proper defendant in the present case. *See* Fed. R. App. P. 43(c)(2). Thus, we affirm the district court's dismissal of Mulhall's claim against the FBI on this alternative ground. The merit of Mulhall's Title VII retaliation claim against the attorney general is discussed in the next section.

## B. Summary Judgment on Mulhall's Title VII Retaliation Claim

We review the grant of summary judgment de novo. As we explained in *Employers Insurance of Wausau v. Petroleum Specialities, Inc.*, 69 F.3d 98 (6th Cir. 1995):

The moving party need not support its motion with evidence disproving the nonmoving party's claim, but need only "'show[]' — that is, point[ ] out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case. *Celotex*, 477 U.S. at 322. The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (*quoting Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

*Id.* at 102 (parallel citations omitted).

We have held that, to establish a prima facie case of Title VII retaliation, a plaintiff must show that "1) plaintiff engaged

uncovered through discovery further supported the circumstantial evidence that he had already presented with respect to the causal connection, *see* J.A. at 245-50, and that the FBI had failed to rebut his prima facie case, *see* J.A. at 250-52.

The district court granted the FBI summary judgment on November 27, 2000. The district court concluded that

in the final analysis, Mulhall has absolutely nothing to refute the unequivocal statements of the individuals involved that neither Metcalfe nor Ray knew that Mulhall was listed as a witness for [Henderson]. Nothing was revealed in discovery to substantiate or bolster this inference of retaliation gleaned solely from the timing of the arrival of the complaint in the office and the drafting and sending of the letter.

J.A. at 33.

This timely appeal followed.

## II. ANALYSIS

### A. Appellate Jurisdiction

As noted *supra*, the district court's order granting the FBI summary judgment failed to address the status of Mulhall's claim against the attorney general. This was merely a technical error, as the district court clearly intended to grant summary judgment to both defendants and issue a final order in the case. *See* J.A. at 35 (Order) ("[T]his is a final order."). *See also* J.A. at 8 (Docket) ("This is a final order.").

Despite the clear intent of the district court, we must first address whether the district court in fact issued a final, appealable order in the present case. The Ninth Circuit has held that the district court's inadvertent omission of a party's name does not defeat the appellate court's jurisdiction where the district court "clearly intended" its grant of summary judgment to constitute a final, appealable order. *Johnson v.*

*Meltzer*, 134 F.3d 1393, 1396 (9th Cir.), *cert. denied*, 525 U.S. 840 (1998). We adopt this approach and treat the district court's November 27, 2000 order as a final order coming within this court's jurisdiction pursuant to 28 U.S.C. § 1291.

This approach makes sense because the district court's order terminated the litigation on the merits. *See SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 664 (6th Cir. 2001) ("A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.") (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)). In addition, this approach is warranted given that neither party would be prejudiced by treating the court's order as final. In *Bankers Trust Co. v. Mallis*, 435 U.S. 381 (1978), the Supreme Court considered the issue "whether a decision of a district court can be a 'final decision' for purposes of § 1291 if not set forth on a document separate from the opinion," as required by Federal Rule of Civil Procedure 58. *Id.* at 383. The Court concluded that the separate-document rule could be waived by the parties, at least where "the District Court clearly evidenced its intent that the opinion and order from which an appeal was taken would represent the final decision in the case." *Id.* at 387. In reaching this conclusion, the Court reasoned that the separate-document rule was intended "to clarify when the time for appeal . . . begins to run," *id.* at 384, and that its application where the timeliness of an appeal was not at issue would merely cause delay:

> Certainty as to timeliness, however, is not advanced by holding that appellate jurisdiction does not exist absent a separate judgment. If, by error, a separate judgment is not filed before a party appeals, nothing but delay would flow from requiring the court of appeals to dismiss the appeal. Upon dismissal, the district court would simply file and enter the separate judgment, from which a timely appeal would then be taken. Wheels would spin for no practical purpose.

*Id.* at 385.

Similarly, remanding the present case for entry of an order granting summary judgment to the attorney general, before reviewing that judgment on the merits, would merely make "[w]heels . . . spin for no practical purpose." The Appellees, who raise this issue in their brief, request that we dismiss the present appeal, remand the case to the district court for entry of a final order, and then consider the case on the merits without further briefing or oral argument. *See* Appellees' Br. at 2, 13. But such an approach would serve no practical purpose. Instead, we will pursue a more pragmatic approach, treating the district court's order as a final, appealable order and thus proceeding to the merits of the case.[4]

Moreover, this pragmatic approach is appropriate where there is really only one defendant in a case — in this case, the attorney general. The Appellees are correct in arguing, on appeal, that the FBI is not a proper defendant in a Title VII action. In *Hancock v. Egger*, 848 F.2d 87 (6th Cir. 1988), we construed 42 U.S.C. § 2000e-16(c), which "mandates who may be a proper defendant in civil actions brought by federal employees to enforce rights under Title VII," *id.* at 88, as requiring that plaintiffs suing subunits of cabinet-level departments name the relevant department head as defendant, *see id.* at 89. In *Hancock*, the plaintiff sued the commissioner of the IRS for racial discrimination. The district court granted defendant's motion to dismiss, concluding that the IRS commissioner was not a proper defendant under § 2000e-16(c). This court affirmed, holding that the Secretary of the Treasury, as head of the Treasury Department, was the proper defendant in a suit alleging racial discrimination by the IRS. *See id.*

---

[4]The leading treatise on federal procedure advocates this pragmatic approach to such technical defects: "[P]ragmatic assessments of the district court actions may show that in fact finality has resulted from disposition as to all parties. . . . Parties who have been dismissed de facto will be counted as if actually dismissed. . . . None of these practices causes any difficulty." 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3914.7, at 553-56 (2d ed. 1992) (footnotes omitted).